## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **ROBIN DARNELL,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:08cv00066 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | By:  PAMELA MEADE SARGENT |
| Defendant. | ) | UNITED STATES MAGISTRATE JUDGE |

*I. Background and Standard of Review*

The plaintiff, Robin Darnell, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2009).  Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B).  As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more

than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Darnell protectively filed her application for DIB on June 8, 2006, alleging disability as of April 1, 2005,[1] based on chronic fatigue syndrome, migraine headaches, sciatic nerve problems, problems with her right eye and restless leg syndrome. (Record, ("R."), at 15, 102-06, 154.) The claim was denied initially and upon reconsideration. (R. at 53-55, 58-60, 63, 64-66.) Darnell then requested a hearing before an administrative law judge, ("ALJ"). (R. at 69.) The ALJ held two hearings, the first of which was held on February 11, 2008, and the second which was held on May 12, 2008, at which Darnell was represented by counsel. (R. at 27-49.)

By decision dated May 28, 2008, the ALJ denied Darnell's claim. (R. at 15-26.) The ALJ found that Darnell met the nondisability insured status requirements of the Act for DIB purposes through March 31, 2010. (R. at 17.) The ALJ also found that Darnell had not engaged in substantial gainful activity since April 1, 2005.[2] (R. at 17.) The ALJ found that the medical evidence established that Darnell suffered from severe impairments, namely hypertension, restless leg syndrome, chronic fatigue,

---

[1] Darnell indicated on her DIB application that she became disabled on December 23, 2004. (R. at 102.) However, she amended her onset date to April 1, 2005, at her hearing. (R. at 44.)

[2] Darnell's alleged date of disability was April 1, 2005, and her date last insured is March 31, 2010. Therefore, the relevant time period is April 1, 2005, through March 31, 2010.

osteoarthritis, a mild to moderate depressive disorder, not otherwise specified, and a low average range of intelligence, but he found that Darnell did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17, 22.) The ALJ also found that Darnell had the residual functional capacity to perform simple, repetitive, routine light work[3] that was not precluded by the restrictions identified by Dr. William Humphries, M.D., and that did not require more than occasionally working with the public. (R. at 23, 464-75.) Therefore, the ALJ found that Darnell was unable to perform her past relevant work. (R. at 25.) Based on Darnell's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that other jobs existed in significant numbers in the national economy that Darnell could perform, including those of a cleaner, a general laborer, a food service worker and a stock clerk. (R. at 25.) Thus, the ALJ found that Darnell was not under a disability as defined under the Act, and she was not eligible for benefits. (R. at 26.) *See* 20 C.F.R. § 404.1520(g) (2009).

After the ALJ issued his decision, Darnell pursued her administrative appeals, (R. at 10), but the Appeals Council denied her request for review. (R. at 1-4.) Darnell then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2009). This case is before the court on Darnell's motion for summary judgment filed March 31, 2009, and on the Commissioner's motion for summary judgment filed May 1, 2009.

---

[3]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, she also can do sedentary work. *See* 20 C.F.R. § 404.1567(b) (2009).

*II. Facts*

Darnell was born in 1962, which classifies her as a "younger person" under 20 C.F.R. § 404.1563(c). (R. at 102.) Darnell obtained her general equivalency development, ("GED"), diploma and has past relevant work experience as a cashier, a receptionist and a veterinary assistant. (R. at 141, 155, 161.)

Donna J. Bardsley, a vocational expert, was present and testified at Darnell's second hearing. (R. at 36-38.) Bardsley classified Darnell's past work as a cashier as unskilled, medium[4] work. (R. at 37.) Bardsley classified Darnell's past work as a veterinary assistant as semiskilled, heavy[5] work. (R. at 37.) Bardsley was asked to consider an individual of Darnell's age, education and past work experience who had the residual functional capacity to perform simple, routine, repetitive light work that was consistent with Dr. Humphries's assessment and that required only occasional contact with the public, co-workers and supervisors. (R. at 37, 464-75.) Bardsley stated that there would be a significant number of jobs available in the economy that such an individual could perform, including jobs as a cleaner, a general laborer, food service related occupations and a stock clerk. (R. at 37.) Bardsley was asked to consider the same individual, but who would require a sit/stand option. (R. at 38.) She stated that there would be no jobs available that such an individual could perform. (R.

---

[4]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2009).

[5]Heavy work involves lifting objects weighing up to 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, she also can do medium, light and sedentary work. *See* 20 C.F.R. § 404.1567(d) (2009).

at 38.) Bardsley was next asked to consider the first hypothetical individual, but who would have the residual functional capacity to perform sedentary[6] work. (R. at 38.) Bardsley stated that there would be no jobs available that such an individual could perform at the sedentary level. (R. at 38.) Bardsley also testifed that an individual of Darnell's age, education and work experience who was limited as testified to by Darnell would not be able to perform any jobs. (R. at 38.) She also stated that there would be no jobs available should the individual miss three days of work a month or more. (R. at 38.)

In rendering his decision, the ALJ reviewed medical records from Dr. Larry T. Wilson, M.D.; Hugh Tenison, Ph.D., a state agency psychologist; Dr. Frank M. Johnson, M.D., a state agency physician; University of Virginia; Dr. Donny Reeves, M.D.; Southeastern Retina Associates, P.C.; Dr. Joseph Duckwall, M.D., a state agency physician; Joseph I. Leizer, Ph.D., a state agency psychologist; Robert S. Spangler, Ph.D., a licensed psychologist; and Dr. William Humphries, M.D. Darnell's attorney submitted additional medical records from Dr. Wilson to the Appeals Council.[7]

The record shows that Darnell's treating physician, Dr. Larry T. Wilson, M.D.,

---

[6]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2009).

[7]Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 1-4), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

began treating her in March 2002 for complaints of stress, hypertension, depression, chronic sinus congestion and migraine headaches. (R. at 219.) Darnell was prescribed Paxil. (R. at 220.) In May 2002, Darnell reported that her symptoms of depression had improved since taking her medication. (R. at 226.) In July 2002, Darnell reported that she felt very good since taking Paxil. (R. at 233-34.) She had no complaints of depression and reported that her sinuses also had improved with medication. (R. at 233.) On August 20, 2002, Darnell complained of migraine headaches. (R. at 236-37.) On August 28, 2002, she was diagnosed with sinusitis. (R. at 238-39.) In April 2003, Darnell complained of back pain, which she reported was worsened by prolonged standing or lifting, and foot pain that radiated up into the back of her legs. (R. at 248-49.) She reported that her depression was well-controlled with medication. (R. at 248.) Dr. Wilson diagnosed lower back muscle spasms, hypertension and depression. (R. at 248.) In May 2004, Darnell complained of low back and hip pain. (R. at 262-63.) She reported that her depression was well-controlled with medication. (R. at 263.) She was diagnosed with hypertension. (R. at 263.)

In January, February and March 2005, Darnell was diagnosed with sinusitis. (R. at 277-85.) On March 15, 2005, Dr. Wilson reported that Darnell was ambulatory with a steady gait and free of acute injury. (R. at 286-87.) He reported that she was able to move all extremities with full range of motion. (R. at 286.) She had a normal affect and demeanor. (R. at 287.) Dr. Wilson diagnosed chronic fatigue syndrome and depression. (R. at 287.) In April 2005, Dr. Wilson reported that clinically he saw "very little wrong" and that Darnell's symptoms were by far in excess of physical findings. (R. at 289.) He suspected underlying depression that was worsening. (R. at 289.) In November 2005, Darnell's hypertension was modestly controlled, and her

depression was well-controlled with medication. (R. at 290-91.) Dr. Wilson reported that Darnell's chronic fatigue syndrome likely was related to depression. (R. at 291.) Darnell stated that she felt better when she did not work. (R. at 291.)

In May 2006, Darnell reported that she was having problems with her right eye. (R. at 345-46.) She had 20/30 vision in both eyes. (R. at 346.) In August 2006, Darnell complained of knee pain. (R. at 347-48.) Dr. Wilson recommended that she take glucosamine and chondroitin. (R. at 348.) On December 11, 2006, an x-ray of Darnell's left knee showed mild osteoarthritis. (R. at 353.) On December 18, 2006, Darnell reported an inability to bear weight on the left knee after feeling a pop and stabbing pain while walking up stairs. (R. at 354.) She reported significant pain, and Dr. Wilson administered an injection of Decadron. (R. at 355.) He ordered an MRI of Darnell's left knee. (R. at 355.) In January 2007, an MRI of the left knee showed a medial meniscal tear, moderate joint effusion and marrow changes consistent with red marrow reconversion. (R. at 356-57, 443-44.) In February 2007, Darnell saw Dr. Beau M. Cassidy, M.D., an orthopedist, at the request of Dr. Wilson. (R. at 360-62.) Dr. Cassidy confirmed a right knee medial meniscus tear, and arthroscopic surgery was recommended. (R. at 361-62.) Darnell elected to proceed with the surgery.[8] (R. at 361.) In March 2007, Darnell complained of bilateral leg pain and hip pain. (R. at 363-64.) Dr. Wilson reported that Darnell was ambulatory with a steady gait and free of acute injury. (R. at 364.) She was able to move all extremities with full range of motion and denied pain with movements. (R. at 364.) Her affect and demeanor were normal. (R. at 364.) In August 2007, Darnell complained of fatigue and body aches,

---

[8]There is nothing in the record to indicate that Darnell followed through with this surgery.

including pain in both knees, with the left one being worse. (R. at 368-69.) Dr. Wilson diagnosed acute sinusitis, hypertension and fatigue. (R. at 369.) In September 2007, Darnell's hypertension was not well-controlled. (R. at 371-72.) She complained of continued left knee pain and worsening right knee pain. (R. at 372.) Dr. Wilson noted that Darnell was using a walker. (R. at 372.) He reported that he would refrain from ordering x-rays or other diagnostic tests until Darnell was in a "more financially viable position." (R. at 372.)

In January 2008, Dr. Wilson completed a chronic fatigue syndrome questionnaire, indicating that Darnell suffered from chronic fatigue syndrome, as well as hypertension, high cholesterol and restless leg syndrome. (R. at 432-36.) He reported that her prognosis was good. (R. at 432.) Dr. Wilson reported that Darnell had muscle pain; headaches of a new type, pattern or severity; unrefreshing sleep; and post-exertional malaise lasting for more than 24 hours, which had persisted or recurred during six or more consecutive months. (R. at 433.) He reported that Darnell's emotional factors contributed to her symptoms. (R. at 433.) He indicated that Darnell would require a job that allowed her to shift positions. (R. at 435.) In an office note dated January 24, 2008, Dr. Wilson stated that Darnell had "intermittent issues" with headaches, muscle pain and fatigue. (R. at 479.)

In May 2008, Dr. Wilson completed a headache questionnaire, indicating that Darnell was diagnosed with hypertension, chronic fatigue syndrome, depression and migraine headaches. (R. at 483-89.) He reported that her headaches were associated with nausea/vomiting, photosensitivity and mood changes. (R. at 484-85.) He reported that he did not know the approximate frequency of Darnell's headaches, but

that the duration of her headaches was hours. (R. at 484.) Dr. Wilson reported that lack of sleep, noise and stress triggered Darnell's headaches. (R. at 484.) Bright lights, moving around and noise made her headaches worse. (R. at 484.) He indicated that an objective sign of Darnell's headaches was impaired sleep. (R. at 486.) He reported that emotional factors contributed "somewhat" to the severity of Darnell's headaches. (R. at 486.) He indicated that Darnell's impairments had lasted or could be expected to last at least 12 months. (R. at 487.) He reported that Darnell would be precluded from performing even basic work activities when she had a headache. (R. at 487.) He reported that Darnell would need unscheduled breaks during the workday. (R. at 487.) Dr. Wilson reported that Darnell could tolerate moderate stress. (R. at 488.) He indicated that Darnell's impairments could cause her to be absent from work more than four times a month and that her chronic fatigue syndrome was a limiting factor, which was severe and unpredictable. (R. at 488.)

On February 27, 2006, Hugh Tenison, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Darnell suffered from a nonsevere affective disorder. (R. at 292-305.) He indicated that Darnell had no restriction on her activities of daily living. (R. at 302.) He also indicated that Darnell had no limitation in maintaining social functioning or in maintaining concentration, persistence or pace and that she had not experienced any repeated episodes of decompensation. (R. at 302.) Tenison deemed her mental allegations to be partially credible. (R. at 304.) On November 28, 2006, Tenison completed another PRTF, indicating that Darnell's impairments were not severe. (R. at 377-90.) No limitations were noted, and Tenison found that Darnell had not experienced any repeated episodes of decompensation. (R. at 387.) He again deemed

her allegations to be partially credible.  (R. at 390.)

On February 28, 2006, Dr. Frank M. Johnson, M.D., a state agency physician, indicated that Darnell had the residual functional capacity to perform light work.  (R. at 306-13.)  No postural, manipulative, visual, communicative or environmental limitations were noted.  (R. at 308-09.)  On November 28, 2006, Dr. Johnson again indicated that Darnell had the residual functional capacity to perform light work.  (R. at 391-97.)  He indicated that Darnell could occasionally climb, stoop, kneel, crouch and crawl and frequently balance.  (R. at 393.)  No manipulative, visual, communicative or environmental limitations were noted.  (R. at 393-94.)  Darnell's statements were deemed partially credible.  (R. at 397.)

On October 16, 2006, Darnell was seen at Southeastern Retina Associates, P.C., for complaints of eye pain and blurred vision. (R. at 373-76.)  She was diagnosed with an abnormal blood vessel growth of the right eye. (R. at 373-74.)  Darnell elected to proceed with laser treatment to correct the problem.  (R. at 374.)

On April 23, 2007, Dr. Joseph Duckwall, M.D., a state agency physician, indicated that Darnell had the residual functional capacity to perform medium work.  (R. at 398-404.)  He indicated that Darnell could occasionally climb, stoop, kneel, crouch and crawl and frequently balance. (R. at 400.)  No manipulative, visual, communicative or environmental limitations were noted. (R. at 400-01.) Dr. Duckwall found Darnell's statements to be partially credible.  (R. at 403.)

On April 25, 2007, Joseph I. Leizer, Ph.D., a state agency psychologist,

completed a PRTF, indicating that Darnell suffered from a nonsevere affective disorder, namely a depressive disorder, not otherwise specified. (R. at 405-18.) No limitations were noted, and Leizer found that Darnell had not experienced any repeated episodes of decompensation. (R. at 415.) Leizer deemed Darnell's allegations partially credible, and he opined that she should be able to perform the mental demands of all levels of work. (R. at 418.)

On February 5, 2008, Robert S. Spangler, Ph.D., a licensed psychologist, evaluated Darnell at the request of Darnell's attorney. (R. at 452-61.) Spangler reported that Darnell seemed socially confident and mildly depressed. (R. at 452.) She demonstrated good concentration and was appropriately persistent on tasks. (R. at 452.) The Wechsler Adult Intelligence Scale-Third Edition, ("WAIS-III"), test was administered, and Darnell obtained a verbal IQ score of 93, a performance IQ score of 89 and a full-scale IQ score of 91. (R. at 455, 460.) Spangler diagnosed Darnell with a mild to moderate depressive disorder, not otherwise specified, and low average range of intelligence. (R. at 456.) Spangler assessed Darnell's Global Assessment of Functioning score, ("GAF"),[9] at 60-55.[10] (R. at 456) Spangler indicated that Darnell's prognosis was fair with regular mental health treatment. (R. at 456.)

---

[9]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[10]It is unclear whether Spangler intended Darnell's GAF score to be 60-65 or 55-60. (R. at 456.) Therefore, I will define both sets of scores. A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning ...." DSM-IV at 32. A GAF score of 61-70 indicates that "[s]ome mild symptoms ... OR some difficulty in social, occupational, or school functioning ... , but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

Spangler completed a mental assessment, indicating that Darnell had a more than satisfactory ability to understand, remember and carry out simple job instructions. (R. at 457-59.) He indicated that Darnell had a limited, but satisfactory, ability to follow simple work rules, to use judgment, to interact with supervisors, to function independently, to maintain attention and concentration and to understand, remember and carry out complex and detailed instructions. (R. at 457-58.) Spangler indicated that Darnell had a limited, but satisfactory, to a seriously limited ability to relate to co-workers, to deal with the public, to deal with work stress, to maintain personal appearance, to behave in an emotionally stable manner and to relate predictably in social situations. (R. at 457-58.) He indicated that Darnell had a seriously limited ability to demonstrate reliability based on her diagnosis of chronic fatigue syndrome. (R. at 458.) Spangler indicated that Darnell would, on average, miss two days of work per month as a result of her impairments. (R. at 459.)

On March 18, 2008, Dr. William Humphries, M.D., examined Darnell at the request of Disability Determination Services. (R. at 464-69.) Upon examination, Darnell had a moderately reduced range of motion of her neck. (R. at 466.) Her back range of motion was mildly reduced with mild to moderate dorsal kyphosis. (R. at 466.) Darnell had reduced range of motion in both shoulders. (R. at 466.) Her memory was intact for recent and remote events, and her intelligence was within normal range. (R. at 467.) Dr. Humphries reported that her affect was flat. (R. at 467.) Dr. Humphries diagnosed Darnell with mild diastolic hypertension; obesity; recurrent, intractable migraine headaches; paresthesias of both hands; chronic lumbar strain with peripheral neuropathy of both lower extremities; chronic fatigue, by history; possible mild degenerative joint disease of the thoracic spine; mild degenerative joint disease

of both feet; and possible degenerative joint disease of both knees. (R. at 467.) Dr. Humphries reported that Darnell would be limited to sitting, standing and walking for up to six hours in an eight-hour workday, to occasionally lifting items weighing up to 50 pounds and up to 25 pounds frequently and to occasional climbing and crawling. (R. at 468.) He reported that Darnell could not perform repetitive gripping and grasping in a production-type situation, that she would be restricted from heights and hazards and that she could not use left foot controls. (R. at 468.)

In a Medical Source Statement Of Ability To Do Work-Related Activities (Physical), Dr. Humphries opined that Darnell could occasionally lift and carry items weighing up to 50 pounds and frequently lift and carry items weighing up to 20 pounds. (R. at 470.) He indicated that Darnell could sit, stand and walk for up to two hours without interruption and a total of six hours in an eight-hour workday. (R. at 471.) He indicated that Darnell could occasionally use both hands to reach overhead and to push and pull, and she could frequently use them to reach, handle, finger and feel. (R. at 472.) Dr. Humphries indicated that Darnell could frequently use both feet for the operation of foot controls. (R. at 472.) He found that Darnell could occasionally climb stairs and ramps, balance and kneel; frequently stoop and crouch; and never climb ladders and scaffolds or crawl. (R. at 473.) Dr. Humphries indicated that Darnell could occasionally operate a motor vehicle, work within temperature extremes and around vibrations; frequently work around humidity and wetness, loud noise, dust, odors, fumes and pulmonary irritants; and never work around unprotected heights or moving mechanical parts. (R. at 474.) He indicated that Darnell had the ability to perform basic activities of daily living. (R. at 475.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2009); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2009).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2003 & Supp. 2009); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated May 28, 2008, the ALJ denied Darnell's claim. (R. at 15-26.) The ALJ found that the medical evidence established that Darnell suffered from severe impairments, namely hypertension, restless leg syndrome, chronic fatigue,

osteoarthritis, a mild to moderate depressive disorder, not otherwise specified, and a low average range of intelligence, but he found that Darnell did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17, 22.) The ALJ also found that Darnell had the residual functional capacity to perform simple, repetitive, routine light work, that was not precluded by the restrictions identified by Dr. Humphries and that did not require more than occasionally working with the public. (R. at 23, 464-75.) Therefore, the ALJ found that Darnell was unable to perform her past relevant work. (R. at 25.) Based on Darnell's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that other jobs existed in significant numbers in the national economy that Darnell could perform. (R. at 25.) Thus, the ALJ found that Darnell was not under a disability as defined under the Act, and she was not eligible for benefits. (R. at 26.) *See* 20 C.F.R. § 404.1520(g).

As stated above, the court's function in the case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical

evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record supports his findings.

In her brief, Darnell argues that the ALJ erred by failing to give proper weight to the findings of her treating physician, Dr. Wilson. (Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 9-13.) Darnell also argues that substantial evidence does not exist to support the ALJ's finding with regard to her residual functional capacity. (Plaintiff's Brief at 14-20.) Darnell further argues that the ALJ's hypothetical question to the vocational expert was flawed. (Plaintiff's Brief at 20-22.)

Darnell argues that the ALJ erred by failing to give proper weight to the findings of Dr. Wilson, her treating physician. The ALJ in this case found that Darnell had the residual functional capacity to perform simple, repetitive, routine light work, that was not precluded by the restrictions identified by Dr. Humphries and that did not require more than occasionally working with the public. (R. at 23, 464-69.) Based on my review of the record, I find that substantial evidence exists to support this finding, as well as the weighing of the medical evidence. The ALJ stated that he had considered the objective medical findings of Dr. Wilson and Dr. Humphries in finding that Darnell could perform light work involving simple repetitive tasks. (R. at 23.)

The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. § 404.1527(d)(2) (2009). However, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). In fact, "if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590. The ALJ did not fail to weigh Dr. Wilson's various statements, but Dr. Wilson was vague and unwilling to provide any medical explanation for his proposed limitations and he declined to offer specific estimates about Darnell's ability to work. (R. at 432-36, 483-89.) Dr. Wilson was uncertain as to the basis of Darnell's symptoms, stating, in the same report, that Darnell's chronic fatigue was the limiting factor in her ability to work, but also writing and crossing out that Darnell "did not have a direct physical impairment other than migraines that would preclude her from working." (R. at 488.) When Darnell complained of chronic fatigue in April 2005, Dr. Wilson reported that clinically he saw "very little wrong," and that Darnell's symptoms were by far in excess of physical findings. (R. at 289.) Moreover, Dr. Wilson's opinions were based on Darnell's self-reported symptoms. Dr. Wilson suspected an underlying and worsening depression, for which he prescribed medication. (R. at 289.) However, there is no indication in the record that Dr. Wilson referred Darnell for mental health treatment. In fact, Darnell repeatedly reported that her depressive symptoms were well-controlled with medication. (R. at 229, 233, 248, 263, 290-91.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

The record shows that nearly all of Darnell's medical complaints were controlled or significantly alleviated with treatment. Although Darnell had alleged disability based on sinus infections and infectious mononucleosis, these conditions resolved in approximately one month. (R. at 277.) Darnell takes over-the-counter medication for her headaches. (R. at 117.) Dr. Wilson prescribed over-the-counter food supplement glucosamine/chondrotin for Darnell's knee pain. (R. at 348.) In March 2008, Darnell reported to Dr. Humphries that she had a 10-year history of migraine headaches, associated with nausea, which occurred on the average of one to two severe headaches per month. (R. at 464-65.) Darnell also reported knee pain secondary to a torn cartilage, but admitted that she could walk a maximum of one mile on a good day. (R. at 464.) According to Dr. Wilson, Darnell "feels that she cannot stand or walk for long periods of time," but the reasons for this are "not known." (R. at 488.)

I note Darnell's argument that none of the state agency physicians considered the January 2007 MRI results showing a left medial meniscus tear. This is true. Only one of the physical assessments completed by the state agency physicians postdated this MRI. Specifically, on April 23, 2007, Dr. Duckwall opined that Darnell could perform less than the full range of medium work. (R. at 398-404.) It does not appear that Dr. Duckwall considered the January 2007 MRI in reaching this finding. (R. at 403.) Nonetheless, the ALJ gave Darnell "every benefit of the doubt" in finding that she could perform less than the full range of light work despite the state agency physicians' findings to the contrary. (R. at 23.)

Darnell also argues that the ALJ improperly evaluated the effect of pain due to migraine headaches and bilateral knee impairments on her ability to work. (Plaintiff's Brief at 17-18.) The Fourth Circuit has adopted a two-step process for determining whether a claimant is disabled by pain. First, there must be objective medical evidence of the existence of a medical impairment which could reasonably be expected to produce the actual amount and degree of pain alleged by the claimant. *See Craig*, 76 F.3d at 594. Second, the intensity and persistence of the claimant's pain must be evaluated, as well as the extent to which the pain affects the claimant's ability to work. *See Craig*, 76 F.3d at 595. Once the first step is met, the ALJ cannot dismiss the claimant's subjective complaints simply because objective evidence of the pain itself is lacking. *See Craig*, 76 F.3d at 595. This does not mean, however, that the ALJ may not use objective medical evidence in evaluating the intensity and persistence of pain. In *Craig*, the court stated:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers....

76 F.3d at 595. As in the case of other factual questions, credibility determinations as to a claimant's testimony regarding her pain are for the ALJ to make. *See Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984). Furthermore, an ALJ's assessment of a claimant's credibility regarding the severity of pain is entitled to great weight when it is supported by the record. *See Shively*, 739 F.2d at 989-90.

The ALJ noted in his opinion that the medical evidence showed that, despite ongoing medical treatment, Darnell continued to have pain which significantly impacted her ability to perform work-related activities. (R. at 24.) He further noted that the treatment for her impairments had been "essentially routine and conservative in nature." (R. at 24.) The ALJ found that Darnell's description of the severity of her pain was "extreme" and unsupported by the medical and other evidence of record, and he found that her allegations of some limitations on her ability to stand, to walk, to lift, to carry, to think, to concentrate and to complete daily activities were credible. However, he found that her allegations of significant limitations on such activities were not credible. For the following reasons, I find that the ALJ properly evaluated the effect of Darnell's pain on her ability to work.

As noted above, in terms of Darnell's chronic fatigue syndrome, Dr. Wilson reported in April 2005 that, clinically, he saw "very little wrong" and that her symptoms were far in excess of the physical findings. (R. at 289.) Additionally, the record reveals that Darnell's impairments were controlled or significantly alleviated with medication and treatment. For instance, Darnell took only over-the-counter medications for her headaches,[11] and in August 2006, Dr. Wilson prescribed the over-the-counter food supplement glucosamine/chondroitin for her knee pain. (R. at 348.) The court notes that, despite the fact that an MRI in January 2007 revealed a meniscus tear for which surgery was recommended, Darnell never underwent this surgery. I note further, however, that the record is replete with references to Darnell's lack of

---

[11]During her March 2008 examination by Dr. Humphries, it was noted that although she had tried the "new generation of migraine treatment medications," the only thing that helped to alleviate her pain was over-the-counter medications. (R. at 464.)

health insurance and inability to afford certain medical treatment. For example, when Dr. Wilson scheduled a referral to an orthopedist, he informed Darnell that, because she was "self-pay," she would have to pay $200.00 at the time of the appointment. (R. at 359.) When Dr. Cassidy recommended knee surgery in February 2007, Darnell was advised that arrangements for payment would need to be made prior to surgery. (R. at 361.) In March 2008, Dr. Wilson reported that he would refrain from performing x-rays or other diagnostic testing until Darnell was in a "more financially viable position." (R. at 372.) Finally, during the March 2008 examination with Dr. Humphries, it was noted that knee surgery had been recommended, but declined due to lack of funding. (R. at 465.)

Nonetheless, after the meniscus tear was diagnosed and surgery was recommended, Darnell advised Dr. Wilson in March 2008 that she could walk a maximum of one mile without interruption on a good day. (R. at 464.) Dr. Wilson noted that, although Darnell felt that she could not stand or walk for long periods of time, the reasons for this were not known. (R. at 488.) Perhaps most importantly, however, are the March 2008 findings of Dr. Humphries. (R. at 464-69.) At that time, physical examination of Darnell's lower extremities revealed a normal range of motion of the knees. (R. at 466.) She had normal strength in both lower extremities with no specific muscle wasting. (R. at 466.) Deep tendon reflexes were 1+ and equal in both knees. (R. at 466.) Dr. Humphries opined that Darnell had no specific motor or sensory loss of the lower extremities. (R. at 467.) All of this being the case, I note that, despite Darnell's financial ability to undergo the recommended knee surgery, the record shows that her continuing limitations were not so severe as to preclude her from the performance of all work-related activities.

For all of these reasons, I find that the ALJ properly evaluated the effect of pain on Darnell's ability to perform work-related activities. For the following reasons, I also find unpersuasive Darnell's argument that the ALJ posed an incomplete hypothetical to the vocational expert, as it did not include all of her impairments.

Darnell contends that it is not possible to determine from the ALJ's decision if all of the limitations noted by Dr. Humphries were considered by the ALJ or the vocational expert. (Plaintiff's Brief at 20-21.) It is well-settled that testimony of a vocational expert constitutes substantial evidence for purposes of judicial review where his or her opinion is based upon a consideration of all the evidence of record and is in response to a proper hypothetical question which fairly sets out all of a claimant's impairments. *See Walker v. Bowen*, 889 F.2d 47, 50 (4ᵗʰ Cir. 1989). The ALJ asked the vocational expert to "assume everything in Exhibit 22, that's Humphries' exam" was true and correct, but that the hypothetical individual would be restricted to simple, routine, repetitive light work that did not require more than occasional contact with the public, co-workers and supervisors. (R. at 37.) Based on my review of the record, I find this argument unpersuasive. Darnell argues that there are inconsistencies between the findings contained in Dr. Humphries's written report and those contained in the Medical Source Statement. The court concedes that such is the case, as Dr. Humphries opined in his written report that Darnell could occasionally climb and crawl, was not restricted in her ability to kneel, could not perform repetitive gripping and grasping in a production-type situation and that she could not use left foot controls, while in the Medical Source Statement, he found that she could never climb ladders or scaffolds and never crawl, could occasionally kneel

and could frequently use both hands to handle, finger and feel objects. (R. at 468, 472-73.) Dr. Humphries's written report and assessment are both marked as Exhibit 22. (R. at 464-75.) The vocational expert was asked to "assume *everything* in Exhibit 22" in determining if jobs existed that Darnell could perform. (R. at 37.) The vocational expert identified the light occupations of a cleaner, a general laborer, a food service worker and a stock clerk within the limitations of Exhibit 22. (R. at 37.) That being the case, I find that the ALJ posed a proper hypothetical to the vocational expert. Based on all of the above, I find that substantial evidence exists to support the ALJ's finding that Darnell was not disabled.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists to support the ALJ's weighing of the medical evidence;

2. Substantial evidence exists to support the ALJ's finding with regard to Darnell's residual functional capacity;

3. Substantial evidence exists to support the ALJ's analysis of the effect of pain on Darnell's ability to work;

4. Substantial evidence exists to support the ALJ's finding that a significant number of jobs exist in the national economy that Darnell can perform; and

5. Substantial evidence exists to support the ALJ's

finding that Darnell is not disabled under the Act.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Darnell's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the final decision of the Commissioner denying benefits.

### **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2009):

>Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Chief United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     February 26, 2010.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE